# 20-4072

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

$\gg\ll$

CHARLES SEIFE,
*Plaintiff-Appellant*,

*v.*

UNITED STATES FOOD AND DRUG ADMINISTRATION and
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendants-Appellees*,

- and -

SAREPTA THERAPEUTICS, INC.,
*Intervenor-Defendant-Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLEE

Daniel R. Bernstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
daniel.bernstein@arnoldporter.com

[*Additional counsel on signature page*]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Intervenor-Appellee Sarepta Therapeutics Inc., by and through its undersigned counsel, states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ..................................................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................2

STATEMENT OF THE CASE..............................................................................2

    A.    Sarepta's Investment in DMD Research Culminated in the FDA's Approval of Eteplirsen, the First Drug Approved in the U.S. to Treat DMD..........................................................................................2

    B.    Plaintiff's FOIA Request And Lawsuit....................................5

    C.    The District Court's Resolution of the Lawsuit in the FDA and Sarepta's Favor...................................................................7

SUMMARY OF ARGUMENT ...........................................................................10

STANDARD OF REVIEW .................................................................................12

ARGUMENT .......................................................................................................13

I.    Legal Background................................................................................13

II.    The District Court Correctly Found that Sarepta Has Kept the Withheld Material Confidential, Thereby Meeting the Applicable Standard for Withholding Under FOIA Exemption 4 .......................................17

    A.    The Withheld Information Is Confidential............................17

    B.    Sarepta Submitted the Information to the FDA Under Assurances of Confidentiality...........................................................21

III.    The District Court Correctly Found That The Agency's Withholding Met Both Current Interpretations Of The FIA's Harm Standard, And That Seife's Invented Standard Has No Basis In FOIA Law. .............................23

    A.    Seife's Invented Test Has No Basis In Statutory Text Or Case Law. 25

    B.    FOIA Exemption 4 Protects Confidential Material ...........................26

IV. Even If a Showing of Competitive Harm Were Required, the Agency and Sarepta More Than Met This Burden. ..............................................30

    A. That "Similar" But Not Identical Information Is Public Is Irrelevant to the Competitive Harm Analysis of the Nonpublic Redacted Information. ..................................................................................31

    B. The District Court Correctly Found Harm to Sarepta's Competitive Interests Would Result From Release of the Confidential Information. ..................................................................................34

V. The District Court Properly Considered the Evidence and Granted Summary Judgment in Defendants' Favor ............................................43

    A. FOIA Cases Are Typically Resolved on Motions for Summary Judgment. ................................................................................43

    B. The District Court Correctly Determined That Seife Failed to Raise A Genuine Issue of Material Fact That Would Preclude Summary Judgment. ................................................................................46

    C. The District Court's Denial of Seife's Motion to Strike a Sarepta Declaration Should Not Be Disturbed. ..............................................50

CONCLUSION ..........................................................................................55

CERTIFICATE OF COMPLIANCE ..........................................................56

CERTIFICATE OF SERVICE ....................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuelhawa v. United States,*
    556 U.S. 816 (2009).........................................................................27

*ACLU v. U.S. Dep't of Def.,*
    901 F.3d 125 (2d Cir. 2018) .............................................................45

*Am. Small Business League, v. U.S. Department Of Defense, et al.,*
    411 F. Supp. 3d 824 (N.D. Cal. 2019).....................................16, 18, 24

*American Society for the Prevention of Cruelty to Animals v. Animal
    and Plant Health Services,*
    2021 WL 1163627 (S.D.N.Y. March 25, 2021)................................22

*Animal Legal Def. Fund v. FDA,*
    836 F.3d 987 (9th Cir. 2016) (en banc) .............................................44

*Bogle-Assegai v. Connecticut,*
    470 F.3d 498 (2d Cir. 2006) .............................................................43

*Boyes v. DOE,*
    2005 WL 607882 (D.D.C. Mar. 16, 2005) .......................................21

*Carney v. U.S. Dep't of Justice,*
    19 F.3d 807 (2d Cir. 1994) ...................................................30, 34, 45

*Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.,*
    951 F.3d 248 (5th Cir. 2020) ...........................................................49

*Citizens for Responsibility and Ethics in Washington v. Dep't of
    Commerce,*
    2020 WL 4732095 (D.D.C. Aug. 14, 2020)......................................15

*Cont'l Stock Transfer & Trust Co. v. SEC,*
    566 F.2d 373 (2d Cir. 1977) .............................................................14

*Ctr. For Investigative Reporting v. Dep't of Interior,*
    2020 WL 1695175 (D.D.C. April 7, 2020)........................................33

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
436 F. Supp. 3d 90 (D.D.C 2019)................................................................16, 24

*Food Marketing Institute v. Argus Leader Media*,
139 S. Ct. 2356 (2019)..................................................................*passim*

*Gertskis v. U.S. E.E.O.C.*,
2013 WL 1148924 (S.D.N.Y. March 20, 2013)...................................................30

*Giannullo v. City of N.Y.*,
322 F.3d 139 (2d Cir. 2003) .....................................................................17

*Gov't Accountability Project v. FDA*,
206 F. Supp. 3d 420 (D.D.C. 2016)...............................................................35

*Hoodho v. Holder*,
558 F.3d 184 (2d Cir. 2009) .....................................................................18

*Inner City Press v. Bd. of Governors of Fed. Reserve Sys.*,
380 F. Supp. 2d 211 (S.D.N.Y. 2005) ............................................................20

*Inner City Press v. Bd. of Governors of Fed. Rsrv. Sys.*,
463 F.3d 239 (2d Cir. 2006) .................................................................12, 32

*Judicial Watch, Inc. v. Food & Drug Admin.*,
449 F.3d 141 (D.C. Cir. 2006)....................................................................36

*Long v. Immigration and Customs Enforcement*,
464 F. Supp. 3d 409 (D.D.C. 2020)...............................................................44

*Long v. Office of Pers. Mgmt.*,
692 F.3d 185 (2d Cir. 2012) .....................................................................45

*Lue v. JPMorgan Chase & Co.*,
768 Fed. App'x 7 (2d Cir 2019) ..................................................................50

*Martin v. Town of Westport*,
558 F. Supp. 2d 228 (D. Conn. 2008).............................................................50

*McDonnell Douglas Corp. v. Nat'l. Aeronautics & Space Admin.*,
180 F.3d 303 (D.C. Cir. 1999)....................................................................29

*Nat'l Parks & Conservation Ass'n v. Kleppe*,
    547 F.2d 673 (D.C. Cir. 1976)........................................................................53

*National Parks & Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974)........................................................................14

*New York Times Co. v. FDA*,
    -- F. Supp. 3d --, 2021 WL 1178126 (S.D.N.Y. March 29, 2021) .....................18

*Pacific Architects & Eng'rs, Inc. v. Dep't of State*,
    906 F.2d 1345 (9th Cir. 1990) ........................................................................29

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016) .....................................................................53, 54

*Pub. Citizen Health Research Grp. v. FDA*,
    185 F.3d 898 (D.C. Cir. 1999)........................................................................40

*R.B. Ventures Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997) .............................................................................46

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ...........................................................................53

*Searles v. First Fortis Life Ins. Co.*,
    98 F. Supp. 2d 456 (S.D.N.Y. 2000) ..............................................................51

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995) .............................................................................51

*Spadaro v. United States Customs & Border Prot.*,
    978 F.3d 34 (2d Cir. 2020) .............................................................................13

*United States v. Braunig*,
    553 F.2d 777 (2d Cir. 1977) ...........................................................................43

*United States v. Local 1804-1, Intern. Long. Ass'n, AFL-CIO*,
    44 F. 3d 1091 (2d Cir. 1995) ..........................................................................50

*Webb v. HHS*,
    696 F.2d 101 (D.C. Cir. 1982)........................................................................42

*Wilner v. Nat'l Sec. Agency*,
  592 F.3d 60 (2d Cir. 2009) .................................................................13, 31, 34

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007) ...................................................................32, 33

*Worthington Compressors, Inc. v. Costle*,
  662 F.2d 45 (D.C. Cir. 1981) ............................................................................42

**Statutes**

5 U.S.C. § 552(a) ...............................................................................................14

5 U.S.C. § 552(a)(8)(A)(i) .............................................................................16, 23

5 U.S.C. § 552(a)(8)(A)(i)(II) ........................................................................23, 24

5 U.S.C. § 552(b)(4).............................................................................................14

5 U.S.C. § 552(b)(5).......................................................................................27, 33

21 U.S.C. § 356(c)(1)(A) .......................................................................................5

**Rules & Regulations**

21 C.F.R. § 20.61(b) ..............................................................................................9

21 C.F.R. § 314.430 ..............................................................................................22

21 C.F.R. § 314.430(e)............................................................................................9

Fed. R. Civ. P. 56(c)(2)........................................................................................50

Fed. R. Evid. 701 .................................................................................................51

**Legislative Materials**

S. Rep. No. 114-4 (2015) .....................................................................................29

vii

**Other Authorities**

Kahn, Randolph, "Economic Espionage in 2017 and Beyond: 10 Shocking Ways They Are Stealing Your Intellectual Property and Corporate Mojo", American Bar Association, May 18, 2017, www.americanbar.org/groups/business_law/publications/blt/2017/05/05_kahn/...................................................................................28

MOORE'S FEDERAL PRACTICE § 56.91[4]...............................................................50

## INTRODUCTION

The district court, applying both the Freedom of Information Act ("FOIA") and the Supreme Court's 2018 seminal decision in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) (*hereinafter "Argus Leader"*), correctly found that intervenor-defendant Sarepta Therapeutics, Inc. ("Sarepta") kept the data withheld under FOIA Exemption 4 confidential, and that Sarepta submitted the data to the Food and Drug Administration ("FDA" or "Agency") under an assurance of confidentiality. The court also correctly found that the Agency easily met the new harm standard imposed by the 2016 FOIA Improvement Act ("FIA"). Indeed, it was undisputed that Sarepta operated in a competitive pharmaceutical industry, invested significant time and money in developing the information Seife seeks, and faced competitors trying to develop rival products. Accordingly, FOIA Exemption 4 applies as a matter of law.

On appeal, plaintiff Charles Seife argues that this Court should impose (1) a new harm standard for FOIA Exemption 4 found nowhere in either FOIA or FIA, and (2) a new obligation for district courts to conduct evidentiary hearings in summary judgment proceedings under FOIA wherever a party raises an issue of fact, regardless of whether the issue is material. This Court should decline both invitations, affirm the ruling below, and deny Seife's appeal in full.

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the district court properly grant summary judgment in favor of the Agency and submitter of information under FOIA Exemption 4 where it was undisputed that the submitter kept the withheld information confidential, operated in a competitive industry, invested significant time and money in developing the information, and faced actual competition from rivals trying to develop competing products?

2. Did the district court correctly decline to apply a novel test for a showing of competitive harm under FOIA Exemption 4 where the proposed test is not supported by the text of FOIA, the FIA, or any controlling case law?

## STATEMENT OF THE CASE

**A.  Sarepta's Investment in DMD Research Culminated in the FDA's Approval of Eteplirsen, the First Drug Approved in the U.S. to Treat DMD**

Duchenne Muscular Dystrophy ("DMD") is a rare, progressively debilitating and ultimately fatal neuromuscular disease affecting approximately 9,000 to 12,000 young men in the United States.  (Estepan Decl. ¶¶ 4-5, JA142.)  DMD is caused by a genetic mutation that results in a lack of dystrophin, a protein vital to the structure and function of muscle cells, and leads to the progressive loss of muscle tissue and function. (*Id.* ¶ 6, JA142.)  For more than half of DMD patients, the disease is caused by the deletion of exons, a sequence within the gene that will be expressed once

2

transcribed by RNA. (*Id.* ¶ 8, JA142.) "Exon skipping" is a molecular biological process used to treat genetic diseases like DMD by instructing the body to "skip over" a segment of the gene sequence during the RNA translation process. (*Id.* ¶ 9, JA143.) In the context of DMD, exon skipping results in the production of a functional, albeit shortened, form of the dystrophin gene. (*Id.*, JA143.)

Sarepta began researching possible treatments for DMD patients in the 2000s. (*Id.* ¶ 11, JA143.) After a multi-year effort that required hundreds of millions of dollars in investment, Sarepta successfully developed eteplirsen, a compound designed to cause exon 51 to be skipped during RNA processing in patients amenable to such skipping (approximately 13% of DMD patients). (*Id.* ¶¶ 12-13, JA143-44.) In 2007, Sarepta submitted to the FDA the eteplirsen Investigational New Drug application. (*Id.* ¶ 14, JA144.) Having achieved preliminary success in proof-of-concept or "Phase 1" clinical studies, Sarepta initiated a 28-week double blind, placebo-controlled "Phase 2" study in 2011 ("Study 201"). (*Id.* ¶ 15, JA144.) Twelve patients, each with DMD mutations amenable to exon 51 skipping, participated in the study. (*Id.* ¶ 17, JA144.) Sarepta transitioned Study 201 into a longer term "Phase 2b" study in 2012 ("Study 202"). (*Id.* ¶ 16, JA144.) Sarepta conducted all its DMD clinical trials with strict confidentiality protocols, including nondisclosure agreements with third-party providers and limited dissemination of study results even within Sarepta. (*Id.* ¶ 19, JA144-45.)

3

The clinical trials at issue here compared the progress of study participants to a historical control by using "endpoint" comparisons to measure drug efficacy. Sarepta used both "clinical" endpoints that consider the direct effects on patients, and "surrogate" endpoints that use lab measurements to track markers related to a disease in Studies 201 and 202. (*Id.* ¶ 35, JA151.) Some endpoints Sarepta used in these clinical trials have been publicly released, while others have not. (*Id.* ¶¶ 36-39, JA151-53; Second Estepan Decl. ¶ 43-44, JA171-72.) After much research and expense, Sarepta chose to use an increase in dystrophin (measured through muscle biopsies taken at designated points during the study) as a surrogate endpoint, which was the ultimate basis for FDA approval of eteplirsen as a treatment for DMD. (Estepan Decl. ¶ 26, JA147.) Sarepta's research into the correct measurement of dystrophin is extremely valuable; the FDA subsequently publicly confirmed that dystrophin is an acceptable surrogate endpoint to achieve accelerated approval for DMD treatments. (*Id.* ¶ 27, JA147-48.)

Sarepta documented the results of Studies 201 and 202 in clinical study reports ("CSRs") submitted to the FDA as part of Sarepta's New Drug Application ("NDA") in June 2015. Each CSR consists of an approximately 100-page narrative document, accompanied by thousands of pages of attachments containing supporting data and background information.

CSRs are carefully controlled even within Sarepta and disclosure is limited to certain members of Sarepta's clinical development, regulatory, biostatistics, and data-management functions along with certain members of the executive committee. (*Id.* ¶ 19, JA144-45.) Sarepta closely guards the confidentiality of clinical trials and the accompanying research, which require investments of hundreds of millions of dollars, not only to preserve its competitive advantage, but also to protect against allegations of prior disclosure that could weaken Sarepta's intellectual property protections. (*Id.*)

The FDA has an accelerated approval procedure for drugs "that treat serious conditions, and that fill an unmet medical need."[1] Sarepta followed this established process, and on September 19, 2016, the FDA granted eteplirsen accelerated approval to treat DMD patients.

### B. Plaintiff's FOIA Request and Lawsuit

Charles Seife, an investigative journalist and a journalism professor, submitted a FOIA request to the FDA in December 2016 seeking information on the agency's decision to approve eteplirsen. On May 25, 2017, Seife filed a complaint challenging the FDA's constructive denial of his FOIA request. The FDA agreed to release the requested materials—which included Sarepta's Clinical Study Reports

---

[1] *See* https://www.fda.gov/drugs/information-health-care-professionals-drugs/accelerated-approval-program; *see also* 21 U.S.C. § 356(c)(1)(A).

for Studies 201 and 202—on a rolling basis, with redactions for confidential or proprietary information. The FDA permitted Sarepta the opportunity to review the materials for confidential, proprietary information prior to its release. Sarepta engaged in multiple good-faith reviews of publicly available information about its clinical studies and redacted only the information that it believed was not previously publicly disclosed and was appropriate for withholding under FOIA Exemption 4. (Second Sherwood Decl. ¶¶ 6-7, 9, JA139.) After Sarepta confirmed all confidential, proprietary information was redacted, the FDA provided the requested documents to Seife, who maintained his lawsuit on the claim that the redactions were improper.

In 2018, the parties filed cross-motions for summary judgment. On January 11, 2019, after the briefs were filed, but before the court ruled on the motions, the Supreme Court granted certiorari in *Food Marketing Institute v. Argus Leader Media*, No. 18-481, a case that called into question the validity of the competitive harm test for FOIA Exemption 4 upon which the parties based their original briefings. In response, the district court suspended the matter pending the Supreme Court's decision. (JA85-86.)

In its suspension order, the district court also directed Sarepta and the FDA to review more than 800 pages of additional public material that Seife had attached to his initial summary judgment briefing. (JA89; Second Sherwood Decl. ¶ 8, JA139.)

6

Sarepta performed a line-by-line review of the 35,000 pages in CSRs 201 and 202, comparing them to both the newly-identified Seife materials as well as additional materials independently identified by Sarepta. (*Id.* ¶ 9b, JA139-40.) While this meticulous review resulted in lifting of redactions on certain material determined to have been publicly released, the vast majority of redactions covered confidential, non-released information and thus remained redacted. (*Id.*, JA139-40.)

The Supreme Court issued its decision in *Argus Leader* on June 24, 2019, fundamentally changing the test for withholding information under FOIA Exemption 4 (as detailed below). 139 S. Ct. 2356 (2019). The district court then ordered supplemental summary judgment briefing addressing the redactions in light of Supreme Court's decision, which the parties filed in fall 2019.

## C.     The District Court's Resolution of the Lawsuit in the FDA and Sarepta's Favor

On October 6, 2020, the district court granted the FDA's and Sarepta's summary judgment motions and denied Seife's motion, finding the redacted information in Sarepta's CSRs to be properly withheld from disclosure under FOIA's Exemption 4. (JA2311.) The district court applied *Argus Leader* to find that the redactions were proper because Sarepta "customarily and actually kept the information at issue confidential at all stages of the clinical study process." (JA2319.) Although some information related to CSRs 201 and 202 had been publicly released, Sarepta had not "disclosed specific information regarding the

7

timing of certain tests, the dosing methods used, specific data tables that include statistical analysis of patient-level indicators, certain exploratory endpoints, and details about the adverse events." (*Id.*) Furthermore, the court found that "such information is subject to strict confidentiality protocols both within and outside of Sarepta." (*Id.*)

The district court, moreover, confirmed that "the information 'was provided to the government under an assurance of privacy,'" thus meeting the second element of the Supreme Court's test in *Argus Leader*. (JA2318-20.) The district court explained that the "nature of the pharmaceutical industry and the FDA regulations themselves" provide an implied assurance of confidentiality, in addition to crediting testimony provided by Sarepta's chief intellectual property counsel about such confidentiality. (JA2319-20.) Thus, the district court held that the redacted information was "confidential" under the standard articulated in *Argus Leader* and appropriately withheld under FOIA Exemption 4. (JA2322.)

Next, the district court considered whether the FIA impacted the propriety of the withholding under Exemption 4. (JA2322-29.) The district court concluded that the FIA did not. First, the court noted that the FIA permitted withholding of documents whose release was "prohibited by law," and found that disclosure of certain requested documents describing confidential clinical study procedures is "prohibited by law" under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et*

8

*seq.* (JA2323-24, citing 21 C.F.R. § 314.430(e); 21 C.F.R. § 20.61(b)).) Seife has not appealed this determination.

Second, the district court explained that where release is not prohibited by law, FIA revised FOIA to state that agencies must consider whether release would foreseeably harm an interest protected by the asserted exemption. (JA2324-25.) The court found that "harm" under the FIA for purposes of Exemption 4 could be analyzed in at least two ways: either the harm foreseen could be the loss of confidentiality itself, or it could be harm to the submitter's competitive interests. (*Id.*) The district court did not choose between either approach, because it found that the Agency and Sarepta had satisfied *both*. (JA2325.)

Under the "confidentiality" test, Sarepta satisfied the requirement because "by definition, disclosure would destroy the confidential nature of the information at issue." (*Id.*) Under the "competitive harm" test as well, Sarepta satisfied the requirement because it "show[ed] through affidavits that Sarepta's competitive interests would be harmed if the non-public clinical study results, exploratory endpoints, and adverse events were disclosed." (JA2325-26.) The court acknowledged the "indisputable" fact that "the pharmaceutical industry is highly competitive," as well as Sarepta's showing that it had "invested a significant amount of time and expense in developing [eteplirsen] and that Sarepta's competitors are hot on its tail working to develop their own DMD treatments." (JA2326.) "[B]etween

9

Defendants' and Sarepta's declarations, and economic common sense, the Court [had] no trouble concluding that release of the information at issue would advantage Sarepta's competitors and cause substantial competitive injury to Sarepta." (JA2327.)  The district court further rejected Seife's "policy" arguments in favor of disclosure.  (*Id.*)

Seife appealed elements of the district court's grant of summary judgment in favor of the FDA and Sarepta and filed his opening brief on April 19, 2021.  This brief follows.

## SUMMARY OF ARGUMENT

The district court's well-reasoned opinion correctly applied FOIA, the FIA, and governing case law.  This court should reject Seife's argument on appeal that, under the FIA, FOIA Exemption 4 should be read to require an even stricter showing of harm than the standard rejected by the Supreme Court in *Argus Leader*, which warned that FOIA (like other statutes) must be interpreted by its own terms, rather than by the policy wishes of courts or parties.  Cobbling together a mishmash of references and terms from the law of contract damages and from cases construing *other* FOIA exemptions, Seife has proposed a brand new, wished-for requirement which states that, in order to qualify for protection under Exemption 4, submitters must show that the requested information has a specific dollar value, and that release of the information would reduce that dollar value.  This test has no support

10

whatsoever in any decided case, and certainly cannot be found in the text of FOIA, as amended by FIA.

The FIA's actual terms require agencies to consider whether release would harm an interest protected by a FOIA exemption. Exemption 4 explicitly names confidentiality as a protected interest. Sarepta demonstrated that it has kept the information at issue in this case confidential, and Seife stipulated that Sarepta has done so. The appeal should end there.

If, however, this Court is inclined to also consider the question of competitive harm, it still should affirm the district court. The court below considered the two different tests for competitive harm that other courts have used in light of the FIA, and found that Sarepta easily met them both. It was undisputed that Sarepta does business in a competitive pharmaceutical industry, that Sarepta invested a significant amount of time and expense in developing a treatment for DMD, and that competitors are trying to develop rival treatments. Seife has not demonstrated any error in the district court's consideration of the extensive evidence of harm submitted by Sarepta. Seife objects that such evidence does not meet the dollar-value standard Seife himself conveniently invented; however, that standard is not the law, or anywhere near it.

Neither did the district court err by granting summary judgment without an evidentiary hearing. Seife's second argument amounts to a request that this Court

11

enshrine a new requirement that every disagreement between rival summary judgment motions must be resolved by a full evidentiary hearing, even if such a hearing was not requested at the trial court level. Moreover, Seife takes the extreme position that every factual assertion by the losing party must be specifically mentioned in a trial court's opinion or else it is deemed to have been formally "excluded." This is not the law. The district court reviewed the record submitted, and issued a ruling with respect to the FOIA Exemption 4 issues actually before the court. Seife's submissions to the district court—like his submissions here—are overwhelmingly directed towards irrelevant issues. That Seife and his declarants believe the FDA's drug approval process was flawed does not make the issue relevant to this straightforward FOIA case. And Seife's bald assertion that his district court submissions were "conclusive" does not obligate the district court to find them so.

The Court should affirm the ruling below and deny Seife's appeal in full.

## STANDARD OF REVIEW

This Circuit reviews *de novo* a district court's grant of summary judgment under a FOIA exemption claim. *See Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Rsrv. Sys.*, 463 F.3d 239, 243 (2d Cir. 2006). While the agency has "the burden of persuasion" when invoking a FOIA exemption "that information is not subject to disclosure under FOIA," the 'party who asserts that material is

12

publicly available carries the burden of production on that issue.'" *Id.* at 245 (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1279 (D.C. Cir. 1992)). An agency withholding documents under a FOIA exemption "can carry its burden to prove the applicability of the claimed exemption by affidavit." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Furthermore, this Court grants affidavits submitted by the government the presumption of good faith. *Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 42 (2d Cir. 2020).

## ARGUMENT

### I.     Legal Background

FOIA requires disclosure of information related to the functioning of the federal government while also exempting certain categories of information from disclosure. The statute's nine exemptions "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Argus Leader*, 139 S. Ct. at 2366 (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

As relevant here, Exemption 4 exempts "trade secrets and commercial or financial information [that is] obtained from a person and privileged or confidential" from disclosure. 5 U.S.C. § 552(a); *id.* § 552(b)(4) (*hereinafter* "Exemption 4"). Thus, a private company's submission of confidential information to the government does not mean that the information automatically becomes public should the government later receive a FOIA request.

The FOIA statute does not define the term "confidential," so for many years courts in many circuits—including this one—applied a test that the D.C. Circuit created in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), which held that withholding information was appropriate under Exemption 4 if disclosure of that information would either "(1) impair[] the government's ability to obtain information — necessary information — in the future, or (2) caus[e] substantial harm to the competitive position of the person from whom the information was obtained." *Cont'l Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 375 (2d Cir. 1977) (per curiam) (adopting the *National Parks* test). Litigation often centered on the latter, "substantial competitive harm" prong of this test.

The Supreme Court rejected this test in *Argus Leader*, explaining that the phrase "substantial competitive harm" appears nowhere in the text of the FOIA statute. *Id.* at 2364 (condemning the *National Parks* test as a "relic from a bygone era of statutory construction," evincing an inappropriately "casual disregard of the

14

rules of statutory interpretation"). The Supreme Court instead looked to the "ordinary, contemporary, common meaning" of the term "confidential," finding it to mean "private" or "secret." *Id.* at 2362-63. The Supreme Court then identified "two conditions that might be required for information communicated to another to be considered confidential." *Id.* at 2363. According to the Court:

> In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret.

*Id.* (citations omitted). In *Argus Leader*, the submitting company clearly met the first condition (it kept the information confidential), and the Court thus found "no need to resolve" the question of whether confidentially held information can "*lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private*," because that condition was met as well. *Id.* (emphasis in original). Courts applying *Argus Leader* to evaluate the proprietary of withholding information from FOIA disclosures under Exemption 4 uniformly have asked whether the submitter of that information kept it confidential, and some courts have additionally asked whether the government provided the submitter with assurances that it would maintain the submitted information confidentially. *See, e.g., Citizens for Responsibility and Ethics in Washington v. Dep't of Commerce*, 2020 WL 4732095, *3 (D.D.C. Aug.

15

14, 2020) ("assuming," without analysis, that some assurance of confidentiality was required and finding the "context" in which the submitter provided the information to be sufficient).

In *Argus Leader*, the Supreme Court did not consider the impact of the 2016 FIA's amendment to FOIA, because the FOIA request in that case was filed prior to 2016. Since *Argus Leader*, courts have differed on how they view the impact on Exemption 4 of the provision of FIA which amended FOIA to provide that an agency shall withhold information under an exemption "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). *Compare Am. Small Business League, v. U.S. Department Of Defense, et al.*, 411 F. Supp. 3d 824, 835-36 (N.D. Cal. 2019) (rejecting plaintiff's contention that "the 2016 FOIA amendments…effectively reinstate the competitive harm test for Exemption 4" and instead only applying *Argus Leader* to require the information be kept confidentially), *with Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113 (D.D.C 2019) (explaining that the "FOIA Improvement Act's 'foreseeable harm' requirement replaces to some extent the 'substantial competitive harm' test that the Supreme Court overruled" in *Argus* and requires defendants to "explain how disclosing, in whole or in part, the specific

16

information withheld under Exemption 4 would harm an interest protected by this exemption").

## II. The District Court Correctly Found That Sarepta Has Kept the Withheld Material Confidential, Thereby Meeting the Applicable Standard for Withholding Under FOIA Exemption 4

The FDA and Sarepta demonstrated that all the redactions to the requested material met the requirements for withholding under Exemption 4, as stated by the Supreme Court in *Argus Leader*. The district court did not err, and there is no reason for this Court to reverse or remand.

### A. The Withheld Information Is Confidential

The confidentiality of the requested material is not seriously in contention in this case. Seife stipulated that "Sarepta's clinical studies for eteplersen [sic] were conducted under strict confidentiality terms"; that "Sarepta has limited the dissemination of the CSRs for eteplersen [sic], even within the company itself"; and that "the stated reason [] from Sarepta [for] such limited dissemination is to protect proprietary information." (Seife's Response to Defendant's Statement of Material Facts, Dkt. 19 para. 27, 37, 38.) Seife never withdrew these admissions, which are binding.[2] *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule

---

[2] Rather, after *Argus Leader* came down, Seife pivoted to alleging (incorrectly) that large swaths of the redacted information had appeared publicly. (*See* Seife Revised Memorandum in Support of Summary Judgment, Dkt. 148, and Seife Reply, Dkt. 162.)

17

56.1 statement, that fact will be deemed admitted."); *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (facts admitted by a party are judicial admissions that bind the party throughout the litigation).

Regardless of Seife's admission, the FDA and Sarepta have repeatedly demonstrated that the redacted information is confidential. *Argus Leader* instructed courts to consider whether the information in dispute "is both customarily and actually treated as private by its owner." *Argus Leader*, 139 S. Ct. at 2366. Courts applying this standard have upheld the withholding of information under Exemption 4 where the submitters "used various methods to protect the information, such as (1) requiring employees and business partners to enter into confidentiality agreements; (2) using restrictive markings on documents and communications; (3) using secure, password-protected IT networks for the information at issue; and/or (4) limiting access to the information at issue on a 'need to know' basis." *Am. Small Business League,* 411 F. Supp. 3d at 831. Courts refer to sworn declarations by the companies that submitted the information in question to make this determination. *See, e.g.*, *New York Times Co. v. FDA*, -- F. Supp. 3d --, 2021 WL 1178126, at *14-15 (S.D.N.Y. March 29, 2021) ("In the wake of *Argus Leader*, FDA's references to averments from [the submitter's] Chief Quality Officer are sufficient to meet the requirement that the company customarily and actually treats the records as private," when the declaration in question states that the records are "treated as highly

confidential within the Company," "are stored on secure IT networks that are password-protected," and "access is granted to employees only on a need-to-know basis").

Sarepta and FDA met this burden by submitting declarations from company officials responsible for ensuring the security and confidentiality of the requested materials. Mr. Christopher Verni, Sarepta's Vice President and Chief Intellectual Property Counsel, is responsible for all Sarepta's legal matters related to intellectual property and described the legal measures Sarepta employs to maintain the confidentiality of the materials at issue. (Verni Decl. ¶¶ 1-2, 4-12, JA112-15; *see* JA2319-20 (discussing Verni Declaration).) Mr. William Thornton, Sarepta's Chief Information Officer, described the multi-level document control and security systems in place to ensure the confidentiality of such data. (Thornton Decl., JA106-10; *see* JA2320 (discussing Thornton Declaration).) And Mr. Ian Estepan, Sarepta's Chief of Staff and Head of Corporate Affairs, described "that the company customarily and actually kept the information at issue confidential at all stages of the clinical study process and thereafter." (Estepan Decl. ¶¶ 43, 52, JA154-57 (explaining the confidentiality markings present on the requested documents, and averring that Sarepta has maintained the information's confidentiality and refused others' requests for access to it).) These uncontroverted statements by officials with personal knowledge establish that Sarepta customarily keeps this information private

19

and controlled. *See Inner City Press v. Bd. of Governors of Fed. Reserve Sys.*, 380 F. Supp. 2d 211, 217-18 (S.D.N.Y. 2005) (granting summary judgment in favor of withholding documents under FOIA Exemption 4 on the basis of a bank vice president's declaration stating "in the ordinary course" the bank would not disclose the requested information).

At the district court level and now again on appeal, Seife repeatedly has cited to reams of publicly available information and claims that the redacted information must appear somewhere within it. In response to each of Seife's assertions in proceedings below, FDA and Sarepta combed through the public record and confirmed that the redacted information appeared nowhere (and in the few instances where it did appear publicly, promptly removed the redaction). (*See* Second Sherwood Decl. ¶¶ 5-9, JA138-40 (describing how Sarepta's counsel reviewed publicly available information in Fall 2017, January 2018, Summer 2018, and Spring 2019; Third Sherwood Decl. ¶¶ 5-10, JA2222-23 (responding to yet additional assertions regarding publicly released material in December 2019).) Every one of the examples cited by Seife here has already been reviewed and addressed in sworn declarations submitted to the district court attesting that Sarepta compared the redacted information to the public materials and confirmed that the information differs from that withheld in this litigation. (*Id.*) Seife has not provided any evidence casting doubt on the veracity of those declarations. Seife instead speculates that the

20

redacted information cannot "differ[] from what it has already disclosed in any economically meaningful way." (Br. at 35.) Nothing in the text of FOIA or any case law requires that a submitter show that nonpublic information differs from public information in an "economically meaningful way" to qualify for Exemption 4. *See infra* (discussing how identical, but not merely similar, information should be not be redacted). Where, as here, a party provides "sworn declarations" demonstrating that the withheld information is not public, and there is no indication of bad faith, courts may rely on those declarations. *Boyes v. DOE*, 2005 WL 607882, at *6-7 (D.D.C. Mar. 16, 2005) (relying on a sworn declaration and stating "[i]t is not enough for a requester to argue that some unspecified amount of the same information 'may' be public in some other forum").

In *Argus Leader*, the Supreme Court made clear that Exemption 4 protection centers on that information's confidentiality. Seife stipulated that Sarepta customarily and actually maintains its clinical study reports as confidential, and Sarepta submitted declarations substantiating this practice in general and as applied to the specific requested information. The district court correctly found that the information is confidential and properly withheld under Exemption 4.

**B. Sarepta Submitted the Information to the FDA Under Assurances of Confidentiality**

As summarized above, the Supreme Court thus far has declined to decide whether confidential information could lose its confidentiality if it was submitted to

21

the government without an assurance that the government would maintain that confidentiality. *Argus Leader*, 139 S. Ct. at 2363. Seife admitted in the court below that Sarepta submitted the information to the FDA under such assurances here. (Seife Revised Motion for Summary Judgment, Dkt. 148 at 34 n. 17.) The district court agreed (JA2319-21), and Seife has not appealed this finding.

This is undeniably the correct holding—Sarepta submitted the documents pursuant to the FDA's regulations, which identify a specific set of documents for release that does not include the requested documents. *See* 21 C.F.R. § 314.430. Notably, that Sarepta submitted the requested information only under assurances of confidentiality speaks to the confidentiality of the documents themselves, as a court in this Circuit has recognized. In *American Society for the Prevention of Cruelty to Animals v. Animal and Plant Health Services*, a district court explained that while the Supreme Court "did not resolve the issue of whether government assurances are necessary to satisfy Exemption 4, such assurances are indisputably relevant to the Exemption 4 analysis." 2021 WL 1163627, *4-5 (S.D.N.Y. March 25, 2021). That court went on to hold that where the submitter was on notice of the agency's consistent practice not to treat the information in question confidentially, then the information lost its confidential status when it was submitted to the agency (emphasis in original)). Here, there is no evidence in the record that Sarepta was on notice of any consistent practice by the FDA of not treating the withheld information

22

as confidential; to the contrary, all the evidence suggests that Sarepta reasonably expected the FDA would hold the information confidentially.

It is undisputed that Sarepta meets this assurance-of-confidentiality element of the *Argus Leader* test (to the extent such an element exists). This Court therefore should affirm the district court's holding as such.

**III. The District Court Correctly Found That the Agency's Withholding Met Both Current Interpretations of The FIA's Harm Standard, and That Seife's Invented Standard Has No Basis In FOIA Law**

The court below fully considered the FIA in ruling that the Agency's withholding complied with FOIA. (JA2322-28.) FIA amended FOIA to state that a document could only be withheld under an exemption if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). The decision below identified the tests for withholding that other courts had applied under *Argus Leader* and the FIA, and it determined that the Agency's withholdings were proper.

The district court first dealt with the actual study documents describing the procedures for Studies 201 and 202, finding that that release of such documents was "prohibited by law," and that they thus could be withheld under 5 U.S.C. § 552(a)(8)(A)(i)(II). (JA2323-24.) Seife does not challenge this aspect of the district court's decision.

23

The court then addressed the meaning of "harm [to] an interest protected by an exemption" under 5 U.S.C. § 552(a)(8)(A)(i)(II). The court correctly noted that other district courts had considered the requirements for Exemption 4 harm in two different ways: On the one hand, *American Small Business League v. U.S. Dep't of Defense*, 411 F. Supp. 3d 824 (N.D. Cal. 2019) held that under *Argus Leader*, "the plain and ordinary meaning of Exemption 4 indicates that the relevant protected interest is that of the information's confidentiality—that is, its private nature." (JA2325, quoting *Am. Small Bus. League*, 411 F. Supp. 3d at 831.) On the other hand, *Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F.Supp.3d 90, 110 (D.D.C. 2019) required the agency to consider whether release would cause "genuine harm to [the submitter's] economic or business interests, and thereby dissuad[e] others from submitting similar information to the government." (JA2325, quoting *Ctr. For Investigative Reporting*, 436 F. Supp. 3d at 113.) In the end, the court below did not choose between these approaches because "either way, Defendants and Sarepta satisfy the foreseeable harm requirement." (*Id.*) The record amply supported this determination.

On appeal, Seife asks this Court to apply an entirely new test, the terms of which (like the defunct *National Parks* test) are found nowhere in either FOIA or FIA, or in any case construing them. This effort should be rejected. If a test is to be chosen at all (which is not necessary to affirm the district court's decision), the test

24

of confidentiality employed by *American Small Business League* and others should be preferred, as it actually derives from the text of the statute. If this Court declines to adopt a specific test, the district court's determination that the record supports the withholding should be left undisturbed.

### A. Seife's Invented Test Has No Basis in Statutory Text or Case Law

Seife's primary argument for reversal is that the court below failed to implement his proposed version of the FIA harm test. (Br. at 18-19; 21-33.) Seife's proposal, however, would require this Court to read new terms into the FIA amendments and to impose a harm test more stringent than the *National Parks* test the Supreme Court stripped away in *Argus Leader*. His claim—that "the agency must reasonably foresee that disclosure would harm the submitter's interest in the economic value of its intangible property"—is found nowhere in FIA, FOIA, or in any case interpreting these laws. Thus, Seife would have this Court replace the overruled judge-made harm test of *National Parks* with another, even stricter one, thereby rendering *Argus Leader* a nullity. To be clear, Seife is not inviting this Court to heal a split, but rather to blaze a completely new trail and find that the lower court erred in declining to apply a harm test Seife made out of whole cloth. (*See* JA2325 n.4 ("Seife eschews both of these standards in favor of a third . . . [b]ut this standard is too narrow and is supported by neither the statute's text nor any relevant precedent.").)

Under *National Parks* and its progeny, submitters were able to satisfy Exemption 4 by demonstrating competitive harm that would proceed from release of information. Under Seife's proffered new test, however, even competitive harm is not enough. For Seife, a submitter must demonstrate that the specific information at issue has a quantifiable dollar value, and that release of that information will lower that value. (Br. at 27-29.) According to Seife, "the law of damages" dictates that only where there has been "a measurable diminution" to the actual "economic value" of the submitter's "intangible property" can Exemption 4 apply. (*Id*. at 27-28.) *None of these terms appear anywhere in either FOIA Exemption 4 or the FIA amendments.* Seife ignores the lesson of *Argus Leader* by insisting that this Court apply a test that appears nowhere in the FIA or FOIA and ignoring that the Supreme Court's directive that FOIA must be read only by its terms.[3]

### B.    FOIA Exemption 4 Protects Confidential Material

Rather than adopt the atextual standard Seife concocted, this Court can simply recognize that the plain language of Exemption 4 protects proprietary information that commercial enterprises keep confidential. If confidentiality was not an interest protected under the exemption, then why was it included among the exemption's spare fifteen words? *See* 5 U.S.C. § 552(b)(5) ("trade secrets and commercial or

---

[3] Seife's test also confounds the meaning of "commercial" under FOIA. If it is necessary to calculate a "measurable diminution" of value before Exemption 4 may apply, this means that information without specific, measurable value could not be protected.

26

financial information obtained from a person [that are] ***privileged or confidential***")
(emphasis added).

To be sure, Seife correctly notes that "every FOIA exemption protects confidentiality." (Br. at 32.) But only one of these exemptions specifically identifies confidentiality as an independent element: Exemption 4. Seife's reliance on the Supreme Court's observation in *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009), that "statutes are not read as a collection of isolated phrases," fares no better. (*Id*. at 24.) Seife invites this Court to do precisely what the Supreme Court forbade, arguing that "[t]he foreseeable harm standard must be read together with the phrases 'trade secrets' and confidential 'commercial or financial' information in Exemption 4." (*Id*. at 23-24.) From his selected set of Exemption 4 "phrases," Seife tellingly omits the explicit reference to confidentiality as an interest protected under the terms of the statute. His interpretation thus flies in the face of *Argus Leader'*s specific warning not to interpret FOIA by "rearranging the text of Exemption 4 to create a phrase that does not appear in the statute." *Argus Leader*, 139 S. Ct. at 2365.

In reality, Seife argues for a distinction without a difference. Confidentiality is not a choice independent of economic activity; it is a choice by a business to expend resources to limit access to its information. It takes financial investment in lawyers to draft and enforce NDAs; in IT professionals and equipment to install secure document-control systems and archives; in security professionals to create

27

secure areas within physical facilities segregating valuable information, and more. Companies spend billions of dollars annually on internal systems and cybersecurity, not just to keep out foreign hackers, but to protect trillions of dollars' worth of confidential IP, and prevent industrial sabotage and disclosure of confidential company information.[4] It can be far less costly to release information than to protect it. It is not clear how the test Seife proposes could more readily identify likely harm than the simple test of confidentiality—i.e. whether FDA release would render all of those company expenditures wasted. Confidentiality, in other words, is a commercial objective, for which business expend resources directed at protecting assets that have business value.[5]

The FIA's addition of "foreseeable harm" does not change Exemption 4's interest in confidentiality. Congress enacted the "foreseeable harm" provision in the FIA to codify a "presumption of openness" that had been stated and reversed in

---

[4] *See* Kahn, Randolph, "Economic Espionage in 2017 and Beyond: 10 Shocking Ways They Are Stealing Your Intellectual Property and Corporate Mojo", American Bar Association, May 18, 2017, *available at* www.americanbar.org/groups/business_law/publications/blt/2017/05/05_kahn/ ("In recent years, the problem of countries, companies, and individuals misappropriating the trade secrets of U.S. companies has only become bigger, more insidious, and more expensive to address, … Economic espionage (sometimes called industrial espionage) is a major drain on competitive advantage, unique IP, and market share. Not only are U.S. companies directly hurt by the theft of their IP, but they may end up competing against their own technology advanced by the IP thief.").

[5] The concern that such a test "would have the tail wag the dog" (Br. at 33) is simply misplaced. To be clear, neither FOIA nor FIA erect a standard whereby mere confidentially results in automatic protection from disclosure. Information must still be found to meet the definition of "commercial or financial" in order for the confidentiality prong to be relevant. In this case, Seife does not dispute that the information at issue is "commercial or financial" under FOIA. Nor does Seife have any serious argument that the information was not kept confidential. *See supra.*

28

executive memoranda in multiple successive administrations, all while striking the proper balance, thus ensuring that this principle was no longer subject to the vagaries of politics. *See* S. Rep. No. 114-4, at 3-8 (2015). The FIA was never intended to revise or weaken the exemptions, but rather to ensure that the exemptions would be employed only where the interests for which they were written were actually at stake. *Id.* at 4. The "presumption of openness" was not intended to drag into the public eye documents that were clearly protected by the explicit terms of the exemptions. *Id*. at 8.[6]

This legislative history does not control the interpretation of the explicit terms of the statute of either FIA or FOIA, but it provides useful context. Was FIA meant, as Seife suggests, to impose a test whereby, in order to obtain protection for even the most clearly confidential business information, submitters must include an accounting in dollars of the potential harm of release? Seife's new test is

---

[6] The FIA's foreseeable harm standard applies only to those FOIA exemptions under which discretionary disclosures can be made. Several FOIA exemptions by their own existing terms cover information that is prohibited from disclosure or exempt from disclosure under a law outside the four corners of FOIA. *See* U.S. Department of Justice, Guide to the Freedom of Information Act, 2009 Edition, at 687–689 (2009) (explaining that "classified information, ***information protected from disclosure by the Trade Secrets Act***, information protected by the Privacy Act, and information protected from disclosure under an Exemption 3 statute are not appropriate subjects of discretionary disclosure") (emphasis added). The Trade Secrets Act is coextensive with the reach of Exemption 4. *See*, *e.g. McDonnell Douglas Corp. v. Nat'l. Aeronautics & Space Admin.*, 180 F.3d 303, 305 (D.C. Cir. 1999); *Pacific Architects & Eng'rs, Inc. v. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990). The court below noted the possibility that all of the contested withholdings were non-discretionary, but declined to rule on that question, because the withholdings fully met the foreseeable harm standard anyway. (JA2324 n.3.)

29

unworkable, and goes far beyond anything found in the statute. The decision in *Argus Leader* counsels strongly against imposing tests and definitions found nowhere in the statute being interpreted.[7] The straightforward standard of confidentiality is based on the explicit language of the statute and recognizes the undeniable business and commercial interest that companies have in implementing and maintaining confidentiality.

## IV. Even If a Showing of Competitive Harm Were Required, the Agency and Sarepta More Than Met This Burden

The district court rejected Seife's proposal for a new test and found that the FDA and Sarepta met any foreseeable competitive harm requirement that may exist in FOIA Exemption 4. (JA2325-27.) Even if this Circuit finds that FOIA Exemption 4 requires a competitive harm analysis, it should agree with the district court.

In a FOIA case, the defending agency may prevail on a motion for summary judgment when it shows that "its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). *See Gertskis v. U.S. E.E.O.C.*, 2013 WL 1148924 at *14 (S.D.N.Y. March 20, 2013) (Furman, J.) (in a FOIA summary judgment motion, an agency need only submit affidavits or declarations that demonstrate

---

[7] Indeed, according to Westlaw, *Argus Leader* has been cited more than 40 times for its textualist lessons (Headnotes 13 and 7), more than twice as often as for its actual FOIA holding (Headnote 17).

(1) the agency's thorough search and (2) a reasonably detailed explanation of why the material is exempt from release) (cites omitted); *Wilner*, 592 F.3d at 73 (affidavit was sufficient to show applicability of claimed exemption).  Sarepta and the FDA submitted declarations detailing the competitive harm that release of the redacted information would cause.  (Estepan Decl., JA141; Second Estepan Decl., JA163; First Sager Decl., JA2248; Second Sager Decl., JA2245.)  The district court did not err in crediting those declarations.

### A.  That "Similar" But Not Identical Information Is Public Is Irrelevant to the Competitive Harm Analysis of the Nonpublic Redacted Information

Seife contends that the fact that information "similar" to the redacted information is public should play into any competitive harm analysis.  (Br. at 33-35.)  This novel argument boils down to the assertion that because different information regarding Sarepta's clinical trials are public, the nonpublic information redacted from the requested document cannot have any competitive value.  This is wrong.  There is no support for this assertion in either case law or common sense.

First, the record shows that only nonpublic information is redacted in the requested documents.  As detailed *supra*, Seife has never engaged with the fact that Sarepta reviewed all the public information he cites and confirmed, in sworn statements, that no public information is redacted.  No matter how much information Sarepta has released related to its clinical trials, it has not released the redacted

information, and that is because Sarepta views that information as competitively sensitive—and has been willing to defend this litigation to prevent its public release.

The district court appropriately relied on Second Circuit precedent for considering only identical public information. (JA88, citing *Inner City Press*, 463 F.3d at 244.) In *Inner City Press*, this Court held that Exemption 4 "does not apply if identical information is otherwise in the public domain," and cited D.C. Circuit precedent for the "rationale behind the public domain doctrine": "if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes." *Id.* (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)). Only if identical information is public does competitive information lose Exemption 4 protection, and demonstrating this is the requester's burden. *Id.* at 245. "Similar" public information is of no import. *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public domain." (citation omitted)). After all, requiring released information be "identical" provides courts and litigants with a clear bright-line rule, whereas requiring evaluation of "similar" information would require inherently subjective and ambiguous judgment calls.

Seife's argument that because allegedly similar information has been publicly released, the information has lost some of its competitive value, is without support.

32

Seife cites only one case for this proposition: a case about FOIA Exemption **5**, which, in contrast to Exemption 4, exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). *Ctr. For Investigative Reporting v. Dep't of Interior*, 2020 WL 1695175 (D.D.C. April 7, 2020). Nowhere does this case mention the competitive value of similar but public information, and whether any withheld information had been made public was not at issue in the case. *Id.*

Under FOIA, public disclosure of "similar" information is simply not enough to void Exemption 4. *Wolf*, *supra*. Just because a pharmaceutical company is obligated by law to publish certain aspects of its clinical studies does not erase the confidentiality or competitive value of the details that remain undisclosed. The only support Seife offers for his assertion that "'withheld granular details' cannot harm Sarepta because these details have only 'incremental value'" (Br. at 33) is the declaration of his own declarant, who avers that these withheld details "are valuable primarily to independent public health researchers" and have "a relatively small incremental value to competitors." (JA303.) There is no requirement that the competitive harm caused by disclosure be inordinately large, and it defies credulity that information so valuable to public health researchers (and to Seife himself) would be without value to private sector researchers. Sarepta is in the best position to know

33

whether release of the information would cause it harm, and has provided ample evidence regarding its steps to maintain confidentiality that belie any assertion that the information is of minimal value. (*See* JA141, JA163 (Estepan Decl. and Second Estepan Decl.).)

**B.     The District Court Correctly Found Harm to Sarepta's Competitive Interests Would Result From Release of the Confidential Information.**

Seife attacks the district court's holding that "Sarepta's competitive interests would be harmed if the non-public clinical study results, exploratory endpoints, and adverse events were disclosed." (JA2326.) The district court's holding was correct. Even if a showing of foreseeable competitive harm were required in the Exemption 4 withholding analysis, Sarepta and the FDA more than met this burden by the submission of multiple detailed declarations that justified each type of withheld information. *Carney*, 19 F.3d at 812; *Wilner*, 592 F.3d at 73.

First, as the district court correctly noted, "it is indisputable that the pharmaceutical industry is highly competitive." (JA2326, citing both the Estepan Declaration and varied court precedent noting the existence of competition in the pharmaceutical industry.) The record established that numerous competitors of Sarepta have been developing potential DMD treatments, a process that necessarily includes the planning and conducting of clinical trials. (*Id.*, citing Estepan Decl. ¶¶ 45-49, 58-59, JA155-56, 158.) Sarepta submitted a detailed declaration naming

34

the precise companies attempting to develop competing drugs. (Estepan Decl. ¶¶ 45-49, JA155-56.) The district court was right when it found that the "record is more than sufficient to establish that competition exists for the development of a DMD drug." (JA2326-27 (citing *Gov't Accountability Project v. FDA*, 206 F. Supp. 3d 420, 439 (D.D.C. 2016).) As in the *Government Accountability Project* case, "[i]t is hard to imagine what more information the FDA and [the submitter] could have provided to demonstrate that [the] drug sponsors face actual competition: their many affidavits are comprehensive, and contain far more than the mere *ipse dixit* that the market is competitive." 206 F. Supp. 3d at 439. Here, too, the affiants "name specific competitors, explain the structure of the market, and/or provide specific examples of instances in which products . . . compete…." *Id.*

Not only does Sarepta operate in a competitive environment, "Sarepta has invested a significant amount of time and expense in developing Exondys 51," as the district court correctly found. (JA2326.) Sarepta began investing in DMD treatment development in the 2000s and only after years of study was able to submit the eteplirsen Investigational New Drug application ("IND") to the FDA in 2007. (Estepan Decl. ¶¶ 11, 14, JA143-44.) Sarepta's research had made enough progress to conduct a clinical study in 2011, and then six months later a follow-up study. (*Id.* ¶¶ 15-16, JA144.) As a direct result of Sarepta's investment and research, the company was able to submit its New Drug Application ("NDA") for eteplirsen in

35

2015. (*Id.* ¶ 20, JA145.) In order to protect this investment, Sarepta restricted the dissemination of information regarding its successful clinical trials even within Sarepta itself. (*Id.* ¶ 19, JA144-45; *see also* Verni Decl. ¶¶ 4-6, JA113-14.) As explained by the D.C. Circuit in a FOIA case involving the releasability of drug application information in response to a FOIA request, "[a]pplicants spend a great deal of resources to obtain data for an IND or NDA, and FDA could not expect full and frank disclosure if it later released such proprietary information into the public domain." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 148-49 (D.C. Cir. 2006).

Faced with these two incontrovertible facts—that the pharmaceutical market is competitive and that Sarepta invested heavily to develop its DMD treatment—the district court observed that "economic common sense" confirms that "release of the information at issue would advantage Sarepta's competitors and cause substantial competitive injury to Sarepta." (JA2327, citing D.C. Circuit cases explaining the uses to which competitors could put such information.)

Seife contends that despite these incontrovertible facts, there is somehow only negligible commercial value to the withheld confidential information. In doing so, Seife asks the court to disregard the declaration of Sarepta's witness with personal knowledge of the competitive landscape and instead credit the speculative declaration of an academic he has engaged to submit a declaration. (*See, e.g.*, Br. at

36

36.) Dr. Peter Lurie claims that the redacted information (which he has not viewed) "is of limited utility to competitors," because he has not seen "evidence that releasing the additional withheld details relating to Sarepta's analysis will be of affirmative use to Sarepta's competitors." (*Id.*, quoting JA298-99.) By contrast, Mr. Estepan, who at the time of his declaration in 2018 had 16 years of experience in healthcare investing, giving him a keen understanding of what information about a drug is commercially valuable, explained in great detail why that release would likely cause competitive harm to Sarepta. (*See* Second Estepan Decl. ¶¶ 4, 7 *et seq.*, JA164; Estepan Decl. at *passim*, JA141-60.)

Seife suggests that the district court did not consider Dr. Lurie's declaration because the declaration is not specifically cited in the court's opinion. But the court considered the evidence submitted, and, based on a review of that evidence, credited Sarepta's view of the commercial significance of the redacted information. (JA2326-27.) This ultimately makes sense, where a for-profit company generated the redacted information as part of its successful quest to develop a drug that it now sells in a very competitive marketplace that multiple other companies are attempting to enter. Indeed, is undisputed that the withheld information is commercial, and

37

"economic common sense" that Sarepta would suffer specific competitive harm were it publicly available to its competitors.[8]

Seife's arguments regarding four particular categories of information are unavailing.

*Clinical study results*: Specifically regarding the redacted clinical study results, Seife claims that dosing information would be "useless to competitors." (Br. at 37-38.) The district court credited Mr. Estepan's statement that "Sarepta's competitors are studying a variety of dosing questions and have yet to determine a final therapeutic dose amount, timing, form, and strength for their drug candidates. Disclosing the unpublished data regarding the dosing approaches Sarepta evaluated would allow competitors to bypass the years of expensive trial and error work and related analysis that Sarepta undertook." (Second Estepan Decl. ¶ 29, JA167; *see also* Estepan Decl. ¶ 25, JA146-47 (explaining that, at the time, Wave Life Sciences and Nippon Shinyaku—some of Sarepta's competitors—were studying dosing, and "[s]election of a final dose, and ultimately a competitive drug candidate, could be informed by data relating to the multiple doses and dosing administration evaluated by the Company in its studies").) These statements

---

[8] To the extent Seife contends that a court to must list each and every document it either rejected or found irrelevant in making its decision, Seife has cited no authority to support that proposition.

sufficiently demonstrate that Sarepta would suffer competitive harm from this information's release.

*Patient level data*:  Seife then contends that de-identified patient level data "could not be used 'in any meaningful way'" by Sarepta's competitors.  (Br. at 38-39.)  This contention, however, rests on the faulty presumption that researchers could use the data he requests, but Sarepta's competitors could not.   Seife's supposition that competitors could not utilize this data is belied by his own declarant's acknowledgment that researchers could utilize this data to "validate" Sarepta's trials.  (Lurie Decl. ¶ 11, JA294.)  As Sarepta has explained, it "spent many years and millions of dollars obtaining, vetting, and using the *anonymized* control data of the type Plaintiff seeks."  (Second Estepan Decl. ¶ 34, JA169 (emphasis in original); *see also* Estepan Decl. ¶ 31, JA149.)  Furthermore, given the small patient population, even de-identified patient data could pose a risk to patient privacy.  (Second Estepan Decl. ¶ 35, JA169; *see also* Estepan Decl. ¶¶ 29-33, JA148-51 (further explaining the competitive harm that would result from the release of the redacted patient-level data).)   FOIA protects this competitively sensitive, confidential information from disclosure due to the risk of competitive harm to Sarepta and intrusion of patient privacy.

*Endpoints*:  Regarding endpoints (the data point measured as part of a clinical study), Dr. Lurie makes the unsupported contention that "the efficacy

39

endpoints that are most commercially valuable are already known in the research community." (Lurie Decl. ¶ 29, JA301; *see also* Br. at 39-40.) The value of an as-yet unknown endpoint, however, could be significant. (Second Estepan Decl. ¶ 31, JA168.) Seife's claim that because Sarepta's primary clinical endpoint is public, the rest of its endpoints should also become public makes no sense for the same reason. (*See* Br. at 39-40) Just as "researchers" could use the redacted information regarding Sarepta's clinical endpoints (*see* Lurie Decl. ¶ 11, JA294), so could Sarepta's competitors. (*See* Second Estepan Decl. ¶¶ 30-31, JA167-68 ("the disclosure of unpublished information regarding Sarepta's exploratory endpoints for eteplirsen would be commercially valuable to Sarepta's competitors, who could use the information both to reproduce Sarepta's prior research and to predict areas of Sarepta's future research.").) It is eminently understandable that "Sarepta does not want to give competitors its full 'playbook'" (*id.* ¶ 31, JA168), and FOIA does not require it. *See Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 905-06 (D.C. Cir. 1999) (finding competitive harm would result from release of proprietary details from new drug application because other companies attempting to enter the market "could make use of the information . . . in order to eliminate much of the time and effort that would otherwise be required to bring to market a product competitive with the [submitting company's product]."). (*See also* Estepan Decl.

¶¶ 34-39, JA151-53 (further explaining the competitive harm that would result from the release of the redacted endpoint information).)

*Adverse events*: Lastly, regarding adverse events, Seife claims that only patients and doctors would be interested in this information. (Br. at 40-41.) Yet it is undisputed that Sarepta's competitors could use the information to advance their own research, which target DMD patients and doctors as their audience and potential customers. (Second Estepan Decl. ¶ 32, JA168; *see also* Estepan Decl. ¶ 40-43, JA153-55 (further explaining the competitive harm that would result from the release of the redacted adverse event information).) Indeed, Sarepta has explained that its stock price has fallen in the past when similar information was released and misconstrued. (Second Estepan Decl. ¶ 33, JA168-69.) Thus, Sarepta reasonably foresees that harm would result from the requested disclosure.

In sum, Seife's claim that the only harm Sarepta could suffer from disclosure of its confidential information is embarrassment is incorrect and a misrepresentation of the record. (Br. at 37.) Mr. Estepan explained that Sarepta's competitors could take advantage of the redacted information to recruit patients for their own clinical studies that compete with Sarepta's, mining negative information from Sarepta's clinical study reports while keeping their own similar information confidential. (Estepan Decl. ¶ 32, JA149.) After all, even in successful clinical trials, clinical study reports may contain negative or unfavorable information. Sarepta's point,

41

however, is not that it would be *embarrassed* by the public release of this information, but rather that the release would place it *at a competitive disadvantage* vis-à-vis its competitors, which have not released similar information. This competitive disadvantage is precisely the type of harm Exemption 4 protects against. *See, e.g.*, *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981) (holding that permitting competitors to forgo costs qualifies as competitive harm under Exemption 4); *Webb v. HHS*, 696 F.2d 101, 103 (D.C. Cir. 1982) (holding that a competitor's ability to use data "without incurring the time, labor, risk, and expense involved in developing them independently" qualifies as competitive harm under Exemption 4).

As a fallback, Seife asked the district court to find that the alleged public interest in Sarepta's confidential information mandates disclosure, no matter the protection afforded such confidential, competitively sensitive information under law. Yet the district court correctly held that there is no public interest component to the Exemption 4 test. (JA2327 ("There is no public policy or public health exception that allows for disclosure where, as here, Exemption 4 and the foreseeable harm requirement (to the extent it applies) are met.").) FOIA's purpose is not advanced by publicly releasing a company's proprietary information upon request. The public's curiosity about a company's business practices is not an interest Exemption 4 protects. And even if this Circuit finds that the interest protected by

42

Exemption 4 requires demonstration of competitive harm, Sarepta and the FDA more than met that burden.

## V.    The District Court Properly Considered the Evidence and Granted Summary Judgment in Defendants' Favor

Seife ends his appeal with a last-ditch, untimely evidentiary challenge and meritless procedural argument. The district court properly resolved this FOIA action on summary judgment, considered the relevant evidence before it, and refused to strike a declaration submitted by a Sarepta employee with personal knowledge. This case proceeded precisely as it was supposed to, and Seife has identified no error necessitating remand.

### A.    FOIA Cases Are Typically Resolved on Motions for Summary Judgment

The district court appropriately resolved this case at the summary judgment stage. As an initial matter, Seife waived any argument that he is entitled to an evidentiary hearing. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006); *see also United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, . . . waiver will bar raising the issue on appeal."). In the proceedings below, Seife never requested an evidentiary hearing. He cross-moved for summary

43

judgment in his own favor and, when opposing Defendants' motion for summary judgment, did not contend that an evidentiary hearing was necessary. (*See* Dkt. Nos. 148, 162.) Thus, because he raises the issue of an evidentiary hearing for the first time on appeal, he has waived it.

Even if Seife had requested an evidentiary hearing (which he did not), this FOIA action still should have been resolved on summary judgment. To be sure, "*some* FOIA cases require resolution of disputed facts." (Br. at 44 (citing *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 989–90 (9th Cir. 2016) (en banc) (emphasis added).) But not all do. "Most FOIA cases are resolved by the district court on summary judgment, with the district court entering judgment as a matter of law." *Animal Legal Def. Fund*, 836 F.3d at 989. *Accord* JA2316 ("Summary judgment is the procedural vehicle by which most FOIA actions are resolved.").

Indeed, as explained in another case Seife cites, "the vast majority of FOIA cases are appropriately resolved on motions for summary judgment." *Long v. Immigration and Customs Enforcement*, 464 F. Supp. 3d 409, 416 (D.D.C. 2020). It is the rare FOIA case that is not resolved by summary judgment papers. *Id.* at 417. *Long* was one of "those rare cases" where, unlike here, the facts bearing on application of an exemption were "genuinely disputed." *Id.*

The Second Circuit recognizes that "[i]n resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of

44

other documentary or testimonial evidence…." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012). The affidavits submitted by an agency in support of its FOIA determinations "are accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks omitted). Ultimately, "the agency's justification is sufficient if it appears logical and plausible." *ACLU v. U.S. Dep't of Def.*, 901 F.3d 125, 133-34 & n.9 (2d Cir. 2018), as amended (Aug. 22, 2018).

Seife's suggestion that there is a particular need for an evidentiary hearing where "the issue is one of 'substantial competitive harm'" falls flat. (*See* Br. at 44 (citing *Animal Legal Def. Fund*, 836 F.3d at 989–90).) His cited case for this proposition—*Animal Legal Defense Fund*—says no such thing. And in any event, as described *supra* in Section I, the issue here is not one of "substantial competitive harm." *See Argus Leader*, 139 S. Ct. at 2366.

Nor is there any support for Amicus' naked assertion that "in an Exemption 4 challenge there will necessarily be material questions of fact and competing evidence presented by the parties, which require fact-finding by the district court to resolve." (Amicus Br. at 13.) Amicus would have this Court upend decades of jurisprudence permitting, and indeed favoring, resolution of FOIA disputes through motions for summary judgment based on affidavits. In any event, the record below demonstrates that the parties here agreed at the district court level that, as is typical in FOIA matters, the case was appropriate for resolution on summary judgment. In

45

short, nothing in the brief submitted by Amicus should persuade this court to reverse or remand the district court's decision.

Of course, courts must "proceed very cautiously" when evaluating the evidence on a motion for summary judgment. (Br. at 44 (citing *R.B. Ventures Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir. 1997)).) "It is well settled, however, that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *R.B. Ventures*, 112 F.3d at 57. "To defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). As demonstrated below, Seife did no such thing.

**B.    The District Court Correctly Determined That Seife Failed to Raise A Genuine Issue of Material Fact That Would Preclude Summary Judgment**

Seife contends that the district court abused its discretion by failing to explain its decision to "exclude" certain evidence. (Br. at 42-44.) But there is no suggestion in the record that the district court "excluded" any evidence. (*See generally* JA2311-29.)   Although the opinion below may not have explicitly referenced each declaration submitted by Seife, the district court explained—correctly—that "Seife offers nothing to undermine the conclusion, based on declarations from those with firsthand knowledge of Sarepta's actual practices, that Sarepta has consistently

46

maintained the confidentiality of the information." (JA2321.) "[B]etween Defendants' and Sarepta's declarations, and economic common sense, the Court ha[d] no trouble concluding that release of the information at issue would advantage Sarepta's competitors and cause substantial competitive injury to Sarepta." (JA2327 (citing *Judicial Watch, Inc.*, 449 F.3d at 148-49 (quoting *Pub. Citizen Health Research Grp.*, 185 F.3d at 905; *Webb*, 696 F.2d at 103 (D.C. Cir. 1982) ("If a manufacturer's competitor could obtain all the data in the manufacturer's NDA, it could utilize them in its own NDA without incurring the time, labor, risk, and expense involved in developing them independently."))).)

Seife sought to raise a variety of fact issues through multiple declarations; these declarations were considered by the district court; and the district court concluded that Seife had "offer[ed] nothing that *undermined*" Sarepta's submissions. (JA2321 (emphasis added).) This conclusion was unsurprising, given that the declarations mostly addressed issues that have no bearing on the parameters of Exemption 4. For example, Seife submitted a declaration from Dr. Lurie, President of the Center for Science in the Public Interest and a former Associate Commissioner of the FDA, arguing with the likelihood that, and extent to which, Sarepta would suffer competitive harm from release of the withheld information. (Lurie Decl., JA290.) Dr. Lurie, who unlike Mr. Estepan does not have broad experience in healthcare investing, opined that certain withheld elements of the data would be of

47

only "some interest" to competitors, would "not likely" harm Sarepta, and were "not reliable enough to support FDA approval of another drug." (Lurie Decl. ¶ 25, 30, JA299, 301.) But this is hardly "conclusive," as Seife suggests. Indeed, Dr. Lurie did not genuinely dispute the fundamental facts on which the district court relied, including the highly competitive nature of the pharmaceutical industry, Sarepta's investment of significant time and money in the development of Exondys 51, and actual competition from Sarepta's competitors.

Dr. Lurie also sought to "expound the public health interest in the release of the requested information." (Br. at 11.) Yet, as the district court observed, "[t]here is no public policy or public health exception" to FOIA Exemption 4. JA2327 (citing *Pub. Citizen v. U.S. Dep't of Health & Human Servs.*, 66 F. Supp. 3d 196, 209 (D.D.C. 2014)). Thus, much of Dr. Lurie's declaration was simply irrelevant to the district court's decision on the confidentiality of the information and harm that would be caused by its release, and there is no indication that the district court improperly disregarded or "excluded" any of it.

In addition, Seife submitted a declaration from Dr. Diana Zuckerman, President of the National Association of Health Research. (Zuckerman Decl., JA336.) That declaration, however, was entirely dedicated to various objections to the FDA's process of approval for Exondys 51. Seife's objections to the FDA's approval process have no relevance to the legal issues before the Court in this FOIA

48

Exemption 4 case. While Seife asserts that his "expert declarations raise 'key and contested' evidentiary issues," his only citation for this is, curiously, a Section 1983 racial discrimination case that does not even use the phrase "key and contested." (Br. at 43 (citing *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)).) Again, Dr. Zuckerman's averments did not speak to the issues before the district court, which accordingly did not cite to them in its decision.

In ruling on a motion for summary judgment, a court need not specifically address each and every piece of evidence submitted. Seife fails to cite any case whatsoever, let alone a Second Circuit case, for such a requirement. And Seife's reliance on *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 269 (5th Cir. 2020), is unavailing. Unlike the present case, *Certain Underwriters* concerned motions to exclude expert testimony. No experts were excluded here. And while the Fifth Circuit in *Certain Underwriters at Lloyd's, London* did remand to provide the district court with an opportunity to explain a decision to exclude a particular expert, the Fifth Circuit also made clear that "we do not hold that all instances in which a district court fails to give reasons for excluding expert evidence constitute reversible error." *Id.* at 270. Significantly, even though the district court here did not specifically address each and every expert declaration plaintiff submitted, it *did* give reasons for its summary judgment decision—reasons

49

explained, at length, in a 19-page Opinion and Order.  (JA2311-30.)  Thus, there is

no basis for a remand.

##### C.     The District Court's Denial of Seife's Motion to Strike a Sarepta Declaration Should Not Be Disturbed

In support of its motion for summary judgment, Sarepta submitted two

declarations from Mr. Estepan that focused on Sarepta's research process and the

competitive harm that he believed would result from release of the withheld

information.  (JA144 and JA163.)  Mr. Estepan was eminently competent to testify

about the matters covered in his declarations.  The district court therefore correctly

denied Seife's motion to strike portions of Mr. Estepan's testimony.  (JA87.)[9]

As an initial matter, the district court's denial of Seife's motion to strike

portions of Mr. Estepan's declaration is entitled to entitled to deference.  *See Lue v.*

*JPMorgan Chase & Co.*, 768 Fed. App'x 7 (2d Cir 2019) (noting that decisions on

a motion to strike have been reviewed for either manifest error or abuse of discretion

in the Second Circuit (citing *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d

Cir. 1999) (manifest error standard); *Design Strategy, Inc. v. Davis*, 469 F. 3d 284,

---

[9] Seife's motion to strike was unnecessary and unfounded.  Rather than file a motion to strike, Seife simply could have noted his objections in his opposition to Defendants' motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(2). "There is no need to make a separate motion to strike." *Id.*, Advisory Committee Note of 2010.  Courts in the Second Circuit strongly disfavor the use of motions to strike to challenge materials submitted in support of or in opposition to a motion for summary judgment. *See, e.g.*, *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 230 (D. Conn. 2008).  *Accord* MOORE'S FEDERAL PRACTICE § 56.91[4] ("Motions to Strike Are Neither Necessary Nor Wanted by the Court").

296 (2d Cir. 2006) (abuse of discretion standard)); *see also United States v. Local 1804-1, Intern. Long. Ass'n, AFL-CIO*, 44 F. 3d 1091, 1095 (2d Cir. 1995) ("As to some matters relating to the management of proceedings before the court, such as the introduction of evidence and the regulation of the course and scope of examination of witnesses, a district court's discretion is broad indeed….").

Seife's argument suffers from numerous infirmities. At bottom, Seife contends that "[t]he portion of Mr. Estepan's declaration that formed the basis for the district court's later opinion was neither based on personal knowledge nor within Mr. Estepan's expert competence." (Br. at 47.) Mr. Estepan, however, was *not* testifying as an expert. And the lay testimony he gave was plainly based on his personal knowledge.

Federal Rule of Evidence 701 permits a lay witness such as Mr. Estepan to testify to an opinion "(a) rationally based on the witness's perception" and "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." *See also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (finding that a company executive has "personal knowledge of his business … sufficient to make … [him] eligible under Rule 701 to testify" about harm to the company); *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) ("An affiant's conclusions based on personal observations over

51

time … may constitute personal knowledge, and an affiant may testify as to the contents of records she reviewed in her official capacity.").

Here, Mr. Estepan not only specifically stated that his opinions were based on personal knowledge (Second Estepan Decl. ¶¶ 3-26, JA163-66), his personal knowledge also could easily be inferred from his then-position with Sarepta as "the Chief of Staff and Head of Corporate Affairs, overseeing Investor Relations, Corporate Communications, and Program Management."[10]   (Estepan Decl. ¶ 1, JA141.)  Further establishing a basis for Mr. Estepan's personal knowledge was the industry experience he described.  As the district court explained:

> The declarations establish that Estepan spent fifteen years investing in healthcare, through which he learned "what types of information about drug development are of interest to investors and commercially valuable." 2d Estepan Decl. ¶ 7.  Estepan "regularly communicate[s] with investors . . . about investments in Sarepta vis-à-vis its competitors" and "closely track[s] the evolving competitive landscape in DMD." *Id.* ¶¶ 23, 24.  He also regularly reviews "medical literature regarding DMD," "reports of nonclinical and clinical trials," and "submissions to the FDA and other regulators"; and he frequently "visit[s]" and "consult[s] with" Sarepta's scientific, medical, and technical personnel. *Id.* ¶¶ 13, 14, 16, 17, 19.  All of that qualifies Estepan to testify to the competitive harms that the disclosures at issue could cause, even if he does not understand the precise scientific value of the disclosures.

---

[10] Mr. Estepan currently serves as Sarepta's Chief Financial Officer.  *See* Press Release, *available at* https://investorrelations.sarepta.com/news-releases/news-release-details/sarepta-therapeutics-announces-executive-management-changes (December 14, 2020).

52

(JA87 (citing *NRDC v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 402 n.10 (S.D.N.Y. 2014); *Carney*, 19 F.3d at 814)).)

Mr. Estepan did not purport to be, nor did the motions for summary judgment require, an expert on genetics, DNA structure, exon skipping, FDA regulations, or economic analysis. Instead, Mr. Estepan offered facts, within his personal knowledge, about the company he works for, its research, its business, and its competitors—facts that informed his opinion on competitive harm, the actual issue under consideration. Courts have refused to accept the contention that FOIA Exemption 4 case law requires a detailed economic analysis of the competitive environment, "the kinds of evidence more usually associated with elaborate antitrust proceedings…." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976). Nor have courts been "convinced of the feasibility and wisdom of imposing such a requirement in fourth exemption cases generally." *Id.* Indeed, the D.C. Circuit noted that "a standard of proof that would render FOIA proceedings any more complex and time consuming would unnecessarily hinder the fair and expeditious administration or adjudication of FOIA requests." *Id.* at 681 n.24.

Seife misplaces reliance on two cases outside the FOIA context, involving expert witnesses. *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000), concerned the calculation of damages based on lost profits in a commercial dispute. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016), was a securities case that involved

53

experts on loss causation and damages who performed extensive economic analyses. In that case, the Second Circuit pointed out that "when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad." *Id.* at 665. Here, by not throwing out the good, the district court acted well within its discretion.

While the district court said it would resolve Seife's challenges to the particular paragraphs of the Estepan declarations "as necessary" (JA87-88), parsing the declarations ultimately was not necessary to resolve the summary judgment motions. As the district court noted, material points were undisputed. (*See* JA2312.)[11] Thus, the district court appropriately granted summary judgment in Defendants' favor.

---

[11] And, as the district court had previously recognized, "[w]hether or not a motion to strike is filed, 'on a motion for summary judgment, a district court may rely only on material that would be admissible at trial.'" (Dkt. 129, District Court's March 27, 2019 Memorandum Opinion at 2 (quoting *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)).)

# CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Dated: July 19, 2021

Respectfully submitted,

*/s/ Daniel R. Bernstein*

Daniel R. Bernstein
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
daniel.bernstein@arnoldporter.com

Kristen E. Ittig
Stuart W. Turner*
Amanda J. Sherwood*
Aime Joo*
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5000
kristen.ittig@arnoldporter.com
stuart.turner@arnoldporter.com
amanda.sherwood@arnoldporter.com
aime.joo@arnoldporter.com
(* applications for admission to be submitted)

*Counsel for
Intervenor-Defendant-Appellee
Sarepta Therapeutics, Inc.*

55

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(A) because it contains 12933 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

Dated: July 19, 2021

*/s/ Daniel R. Bernstein*
Daniel R. Bernstein

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on July 19, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 19, 2021

*/s/ Daniel R. Bernstein*
Daniel R. Bernstein

57